**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

---

|  |  |
|---|---|
| MAJORITY FORWARD; and GAMALIEL WARREN TURNER, SR.,<br><br>     Plaintiffs,<br><br>v.<br><br>BEN HILL COUNTY BOARD OF ELECTIONS; CINDI DUNLAP, in her official capacity as Ben Hill County Elections Supervisor and Chief Registrar; THOMAS GREEN, in his official capacity as MEMBER of the Ben Hill County Board of Elections; DAVID WALKER, in his official capacity as MEMBER of the Ben Hill County Board of Elections; DANNY YOUNG, in his official capacity as MEMBER of the Ben Hill County Board of Elections; GUDRUN MILLS, in his official capacity as MEMBER of the Ben Hill County Board of Elections; PENSON KAMINSKY, in his official capacity as MEMBER of the Ben Hill County Board of Elections; MUSCOGEE COUNTY BOARD OF ELECTIONS AND REGISTRATION; NANCY BOREN, in her official capacity as Muscogee County Director of Elections & Registration; MARGARET JENKINS, in her official capacity as MEMBER of the Muscogee County Board of Elections and Registration; UHLAND ROBERTS, in his official capacity as MEMBER of the Muscogee County Board of Elections and Registration; DIANE SCRIMPSHIRE, in her official capacity as MEMBER of the Muscogee County Board of Elections and Registration; LINDA PARKER, in her official capacity as MEMBER of the Muscogee County Board of Elections and Registration; and ELEANOR WHITE, in her official capacity as MEMBER of the Muscogee County Board of Elections and Registration,<br><br>     Defendants. | Case No. 1:20-cv-00266-LAG |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................................... 1

II.    BACKGROUND ................................................................................................................. 2

    A.   The General Assembly has enacted rules for determining voter residency. ................... 2

    B.   Federal law establishes strict procedures and limitations for removing voters from registration lists following a confirmed change of residence. ........................................ 4

    C.   As part of a statewide voter intimidation effort, individuals file unsupported mass voter-residency challenges on the eve of the January 5, 2021 runoff elections........................ 5

    D.   Electors in Muscogee and Ben Hill Counties relied on inaccurate, unreliable, and inconclusive data to support their mass challenges. ........................................................ 7

    E.   The Boards refuse to reject frivolous mass challenges despite lack of probable cause and place the burden on Targeted Voters to reprove their residency. ............................ 11

III.    ARGUMENT ..................................................................................................................... 12

    A.   Plaintiffs are likely to succeed on the merits. ............................................................... 12

        1.   Plaintiffs' NVRA claims. .......................................................................................... 12

            a.   Section 8(d) claim. .......................................................................................... 13

            b.   Section 8(c) claim. .......................................................................................... 15

        2.   Plaintiffs' Right-to-Vote claim.................................................................................. 16

    B.   Plaintiffs will suffer irreparable harm absent a temporary restraining order. ............... 19

    C.   The balance of the equities and the public interest favor a temporary restraining order. ...................................................................................................................................... 20

IV.    CONCLUSION................................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arcia v. Florida Secretary of State,*
   772 F.3d 1335 (11th Cir. 2014) ...................................................................15, 16

*Autry v. State,*
   626 S.E.2d 528 (Ga. App. 2006)..............................................................................19

*Black Voters Matter Fund v. Raffensperger,*
   No. 1:20-CV-04869-SCJ (N.D. Ga. Dec. 16, 2020), ECF 63.....................................9

*Burdick v. Takushi,*
   504 U.S. 428 (1992).................................................................................................16

*Common Cause Ind. v. Lawson,*
   937 F.3d 944 (7th Cir. 2019) ...................................................................................13

*Common Cause/Ga. v. Billups,*
   554 F.3d 1340 (11th Cir. 2009) ...............................................................................17

*Crawford v. Marion Cnty. Election Bd.,*
   553 U.S. 181 (2008)................................................................................................16

*Democratic Exec. Comm. of Fla. v. Lee,*
   915 F.3d 1312 (11th Cir. 2019) ...................................................................16, 17, 18

*Democratic Party of Ga., Inc. v. Crittenden,*
   347 F. Supp. 3d 1324 (N.D. Ga. 2018) ...................................................................19

*Fla. Democratic Party v. Detzner,*
   No. 4:16cv607-MW/CAS, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016)..............17

*Ga. State Conf. of NAACP v. Georgia,*
   No. 1:17-CV-1397-TCB, 2017 WL 9435558 (N.D. Ga. May 4, 2017)..................20

*Ga. State Conf. of NAACP v. Hancock Cnty. Bd. of Elections & Registration,*
   5:15-CV-00414, 2018 WL 1583160 (M.D. Ga. Mar. 30, 2018)............................14

*Ingram v. Ault,*
   50 F.3d 898 (11th Cir. 1995) (per curiam)..............................................................12

*League of Women Voters of Fla., Inc. v. Detzner,*
   354 F. Supp. 3d 1280 (N.D. Fla. 2018)...................................................................17

*League of Women Voters of Fla. v. Browning,*
   863 F. Supp. 2d 1155 (N.D. Fla. 2012)...................................................................20

*League of Women Voters of N.C. v. North Carolina,*
   769 F.3d 224 (4th Cir. 2014) ..................................................................................19

*Martin v. Crittenden,*
    347 F. Supp. 3d 1302 (N.D. Ga. 2018) ...................................................................20

*Mont. Democratic Party v. Eaton,*
    581 F. Supp. 2d 1077 (D. Mont. 2008) ..............................................................14, 18

*N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't,*
    1:16CV1274, 2018 WL 3748172 (M.D.N.C. Aug. 7, 2018) ...........................14, 15

*Norman v. Reed,*
    502 U.S. 279 (1992) ...................................................................................................16

*Obama for Am. v. Husted,*
    697 F.3d 423 (6th Cir. 2012) ...............................................................................17, 19

*Project Vote, Inc. v. Kemp,*
    208 F. Supp. 3d 1320 (N.D. Ga. 2016) ....................................................................20

*Schmitz v. Fulton Cnty. Bd. of Registration & Elections,*
    2020CV339337 (Super. Ct. Ga. Oct. 1, 2020) .........................................................13

*U.S. Student Ass'n Found. v. Land,*
    546 F.3d 373 (6th Cir. 2008) ....................................................................................13

*United States v. Cleckler,*
    270 F.3d 1331 (11th Cir. 2001) ................................................................................19

*Ybarra v. Illinois,*
    444 U.S. 85 (1979) .....................................................................................................19

*Zimmerman v. State,*
    207 S.E.2d 220 (Ga. App. 1974) ..............................................................................19

**STATUTES**

52 U.S.C. § 20302(a)(1), (2) .............................................................................................3

52 U.S.C. § 20507(c)(2)(A) ..........................................................................................4, 15

52 U.S.C. § 20507(d)(1) ...............................................................................................5, 13

O.C.G.A. § 21-2-216(e) .....................................................................................................3

O.C.G.A. § 21-2-216(f) ......................................................................................................6

O.C.G.A. § 21-2-217(a) ..................................................................................................2, 6

O.C.G.A § 21-2-217(a)(2) .................................................................................................3

O.C.G.A § 21-2-217(a)(8) ...............................................................................................3

O.C.G.A. § 21-2-217(a)(9) ...............................................................................................3

O.C.G.A. § 21-2-217(a)(11) ..............................................................................................3

O.C.G.A. § 21-2-217(a)(14) ..............................................................................................2

O.C.G.A. § 21-2-217(a)(15) ..............................................................................................2

O.C.G.A. § 21-2-217(b) ...............................................................................................3, 12

O.C.G.A. § 21-2-218(a), (b) .............................................................................................6

O.C.G.A § 21-2-218(e) ....................................................................................................3

O.C.G.A. § 21-2-229 ......................................................................................................13

O.C.G.A. § 21-2-230 .................................................................................................13, 18

O.C.G.A. § 21-2-230(i) ...................................................................................................6

O.C.G.A. § 21-2-230(a) ...............................................................................................5, 6

O.C.G.A. § 21-2-230(b) ...................................................................................................5

O.C.G.A. § 21-2-230(c) ...................................................................................................5

O.C.G.A. § 21-2-230 (d)-(i) ..............................................................................................6

O.C.G.A. § 21-2-230(f) ...................................................................................................5

O.C.G.A. §§ 21-2-230(f), (g), (h) ....................................................................................13

O.C.G.A. § 21-2-230(g) ...................................................................................................5

O.C.G.A. § 21-2-230(g), A ...............................................................................................6

O.C.G.A. § 21-2-230(h) .................................................................................................17

O.C.G.A. § 21-2-233(a), (c) .............................................................................................5

O.C.G.A. § 21-2-235 ......................................................................................................5

O.C.G.A. § 21-2-233(c) .................................................................................................18

O.C.G.A. § 21-2-380(b) ...................................................................................................4

**OTHER AUTHORITIES**

Ga. Const. art. II, § 1, ¶ II ................................................................................2

## I.   INTRODUCTION

A dangerous tidal wave of attempted voter suppression has crashed into Georgia, as partisan operatives in every county have filed (or plan to file) mass challenges to over 360,000 voters statewide. Four thousand and thirty-three Muscogee County voters and three hundred and twenty-eight Ben Hill county voters (collectively, "Targeted Voters") have been caught in the deluge, their voting rights in jeopardy for no other reason than that somebody believes they changed a mailing address—an allegation with threadbare evidence that establishes nothing about a voter's eligibility. The results—as expected and as intended—are disastrous. Lifelong Georgia residents fear that casting a regular vote will incur criminal penalties. Georgians working out-of-state with the military wonder if their ballots will count as they scramble to re-prove their residency in time. And civic organizations have been forced to engage in a massive redeployment of resources to ensure that every wrongfully-challenged voter can rebut the unfounded allegations— a task that is triply difficult during a pandemic, over the holiday season, with virtually no time to spare before high-stakes runoff elections for both of Georgia's seats in the United States Senate.

Recognizing the chaos, error, and irreparable damage that is likely to result from baseless and indiscriminate voter challenges, like those that have been lodged here, federal law—namely, the U.S. Constitution and the National Voter Registration Act—unequivocally prohibit any elections official from participating in this scheme and burdening the challenged electors' right to vote or jeopardizing their registration status. While many county boards of elections in Georgia have appropriately denied similar challenges—as the law requires—the Ben Hill Board of Elections and the Muscogee County Board of Elections and Registration (collectively, the "Boards") decided by split votes to proceed with the challenge. This was flatly unlawful. And this Court must order an immediate halt before any challenged voter is needlessly forced to incur the

burden of *re*-establishing their credentials, and before any voter has a ballot discarded or is erased from the registration rolls.

Plaintiffs move for an immediate restraining order enjoining the Boards from taking any further actions against any Targeted Voter and from preventing any Targeted Voter from casting a regular ballot in the runoff elections.

## II.     BACKGROUND

### A.  The General Assembly has enacted rules for determining voter residency.

The Georgia Constitution guarantees the "[r]ight to register and vote" to those "who meet[] minimum residency requirements" Ga. Const. art. II, § 1, ¶ II. Pursuant to this constitutional guarantee, the Georgia General Assembly has established a comprehensive set of rules for "determining the residence of a person desiring to register to vote . . . ." O.C.G.A. § 21-2-217(a).

Georgia's residency-determination rules are extensive, and the General Assembly has carefully crafted them to provide election officials with specific guidelines to apply in determining whether a voter is—or is not—eligible to vote. *Id*. Most of Georgia's residency rules are mandatory—that is, they identify circumstances in which a person "*shall*" or "*shall not*" "be considered to have lost [their] residence in this state" or when an address "*shall* be deemed the person's residence address." O.C.G.A. § 21-2-217(a)(14) (emphasis added). Only one rule is permissive; county election officials "*may* consider evidence of where the person receives significant mail such as personal bills and any other evidence that indicates where the person resides," but that evidence is not conclusive like other rules. O.C.G.A. § 21-2-217(a)(15)

(emphasis added). A determination of residency made by a registrar "shall be *presumptive evidence* of a person's residence for voting purposes." O.C.G.A. § 21-2-217(b) (emphasis added).

Several residency rules identify common circumstances in which voters must be permitted to maintain their residency in Georgia, even if they live away from their voting residence. For example, voters "shall not be considered to have lost [their] residence" if they have temporarily moved, O.C.G.A § 21-2-217(a)(2), are attending a college or university, O.C.G.A § 21-2-217(a)(8), are moving to engage in government service, O.C.G.A. § 21-2-217(a)(11), or even if they intend to move permanently but have not actually done so, O.C.G.A. § 21-2-217(a)(9). In fact, Georgia law explicitly states that "the fact of removal without the intention" "to acquire a new residence . . . shall avail nothing[.]" *Id.*

Other provisions of Georgia and federal law go even further, identifying circumstances in which voters remain eligible despite indefinite or permanent moves. For example, Georgians who permanently move to another state within 30 days of an election are permitted to vote in Georgia so long as they are not registered to vote in their new state. *See* O.C.G.A. § 21-2-216(e). State law also instructs that voters who move from one county to another "after the fifth Monday prior to a primary or election may vote in the county" where they were previously registered. O.C.G.A. § 21-2-218(e). Of course, federal law requires Georgia to permit voting and registration by absent uniformed military voters and overseas voters who are—by definition—located outside of the state. *See* 52 U.S.C. § 20302(a)(1), (2).

Thus, the law is clear that voters do not forfeit their residency (and their right to vote in the state) by simply filling out a National Change of Address card or forwarding their mail to a different address. Any Georgia voters who, for instance, temporarily relocated during the pandemic to be closer to family or care for someone ill, or who moved for a few months to take

college classes, for a work assignment, or for any other number of perfectly valid reasons, may request to receive mail at an address other than where they registered to vote without forfeiting their right to vote in the county where they are registered. There is nothing irregular or unusual about voting while outside of one's voting jurisdiction; the availability of absentee voting is intended to accommodate exactly that. *See* O.C.G.A. § 21-2-380(b).

### B. Federal law establishes strict procedures and limitations for removing voters from registration lists following a confirmed change of residence.

Challenging voter eligibility and removing voters from registration lists close to an election carries a significant risk of disenfranchisement. These practices are notoriously imperfect and erroneously purged voters may be unable to re-register or re-establish their eligibility in time to cast a ballot. Accordingly, Congress has established a series of carefully choreographed procedures to verify voter residency and update voter rolls while minimizing the risk of erroneously removing validly-registered voters.

For one, the NVRA requires that "[a] State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). Numerous courts have found that this express prohibition on removing voters from registration lists within 90 days of an election extends to both regular list maintenance programs and mass challenges to voter eligibility. *See infra* Section III.A.1.a.

Further, Congress has recognized that voting while living outside of one's voting jurisdiction is a routine and entirely permissible occurrence. To protect such voters from erroneous disenfranchisement, the NVRA places strict limitations on a State's authority to cancel a voter's registration—and thereby prevent the voter from casting a regular ballot—due to a purported address change. Specifically, "[a] State *shall not remove* the name of a registrant from the official

4

list of eligible voters in elections for Federal office on the ground that the registrant changed residence *unless*" it follows the procedures set out therein, which require that: (1) the State receive written confirmation from the voter of change of address, or (2) the voter fails to respond to a postcard notice, and subsequently fails to vote in at least two federal general election cycles. 52 U.S.C. § 20507(d)(1) (emphasis added). Georgia law implements these federal requirements through similarly strict procedures for removing voters on the basis of "change of address information supplied by the United States Postal Service," also known as the National Change of Address (NCOA) registry.[1] *See* O.C.G.A. §§ 21-2-233(a), (c), 21-2-235 (requiring notice and affirmative response by voter, or lack of contact with election officials for two general election cycles and additional notice to entirely remove voter from registration list based on change-of-address data).

### C. As part of a statewide voter intimidation effort, individuals file unsupported mass voter-residency challenges on the eve of the January 5, 2021 runoff elections.

Georgia law permits electors within a county to "challenge the right of any other elector of the county . . . to vote in an election." O.C.G.A. § 21-2-230(a), but the board of registrars must "determine whether probable cause exists to sustain such challenge." O.C.G.A. § 21-2-230(b). "If the registrars do not find probable cause, the challenge *shall be denied*." *Id.* (emphasis added). Georgia law provides a few distinct procedures for adjudicating challenges based on whether the challenged individual appears in person to vote or attempts to vote absentee; generally, the board is required to hold a hearing, if practical, to give the challenged voter an opportunity to be heard. *See* O.C.G.A. § 21-2-230(c) (in-person voting); O.C.G.A. § 21-2-230(g) (absentee ballot); O.C.G.A. § 21-2-230(f) (neither). If it is not practical to conduct a hearing prior to the close of

---

[1] The National Change of Address (NCOA) registry is a dataset consisting of the names and addresses of individuals and businesses who have filed a change-of-address with the U.S. Postal Service.

polls, the challenged elector shall be permitted to vote by casting a challenged ballot, which is equivalent to a provisional ballot. O.C.G.A. § 21-2-230(i).

Because residency challenges, by definition, are "based upon grounds that the challenged elector[s] [are] not qualified to remain on the list of electors," O.C.G.A. § 21-2-230(g),[2] if the Board ultimately upholds the challenges after holding a hearing, the challenged electors will not be permitted to vote, any provisional ballots will not be counted, and the challenged electors' names will be removed from the voting rolls. O.C.G.A. § 21-2-230 (d)-(i).

On December 14, 2020—after the runoff election was already underway—the Chair of the Muscogee County Republican Party, Ralph Russell, submitted a mass challenge to the Muscogee Board under O.C.G.A. § 21-2-230(a) against 4,033 individuals (the "Targeted Voters") registered to vote in Muscogee County. *See Notice of Challenge* ("Notice"), Ex. 1. Russell's challenge alleges a "belie[f]" that all 4,033 Targeted Voters are ineligible to vote because they have "lost their residence in Muscogee County." *Id.* at 1-2. He claims that the Targeted Voters were identified by "running the Muscogee County voter registration data base against the National Change of Address Registry." *Id.* at 1. A largely identical mass challenge based solely on NCOA data was mounted in Ben Hill County by Tommy Roberts—a city councilor in Fitzgerald, Georgia—against 328 Targeted Voters.

---

[2] A challenge based on residency inherently alleges that a voter is improperly registered. *See, e.g.*, O.C.G.A. § 21-2-216(f) ("No person shall remain an elector longer than such person shall retain the qualifications under which such person registered."); O.C.G.A. § 21-2-217(a) (establishing rules for determining residency for the purpose of registration); O.C.G.A. § 21-2-218(a), (b) (establishing that permanently moving and registering to vote in another state or county results in cancellation of voter's registration in the former place of residence).

On December 18, True the Vote—a Tea-Party affiliated organization with a history of using voter challenges and other tactics to intimidate and suppress minority voters[3]—announced that it was behind these and other challenges to more than 360,000 voters across the State of Georgia.[4]

### D. Electors in Muscogee and Ben Hill Counties relied on inaccurate, unreliable, and inconclusive data to support their mass challenges.

The mass challenges submitted to the Boards rely solely on deeply-flawed data—lists of individuals whose names the challengers claimed appeared in the National Change of Address registry—that is ultimately meaningless in determining voter eligibility.

**First**, the challenge letter provides no details of the methodology used to compare the county voter registration lists against the NCOA registry. The Muscogee County challenge states that "the information was gathered by *running* the Muscogee County registration data base *against* the National Change of Address Registry," Notice at 1 (emphasis added). While it may sound impressive, "*running against*" is a meaningless term—it provides the Boards with absolutely no information about *how* the list was generated. Declaration of Kenneth Mayer ("Mayer Decl."), Ex. 2. Without a detailed explanation, it is impossible to determine the reliability (and accuracy) of his match list. Remarkably, the challengers likely do not even have the answers to these questions.

---

[3] *See, e.g.*, Dan Harris & Melia Patria, *Is True the Vote Intimidating Minority Voters from Going to the Polls?*, ABC News (Nov. 1, 2012), https://abcnews.go.com/Politics/true-vote-intimidating-minority-voters-polls/story?id=17618823; Suevon Lee, *A Reading Guide to True the Vote, the Controversial Voter Fraud Watchdog*, ProPublica (Sept. 27, 2012), https://www.propublica.org/article/a-reading-guide-to-true-the-vote-the-controversial-voter-fraud-watchdog; Liz Kennedy et al., *Bullies at the Ballot Box: Protecting the Freedom to Vote Against Wrongful Challenges and Intimidation*, Dēmos (Sept. 10, 2012), https://www.demos.org/research/bullies-ballot-box-protecting-freedom-vote-against-wrongful-challenges-and-intimidation.
[4] *True the Vote Partners with Georgians in Every County to Preemptively Challenge 364,541 Potentially Ineligible Voters*, True the Vote (Dec. 18, 2020), https://truethevote.org/true-the-vote-partners-with-georgians-in-every-county-to-preemptively-challenge-364541-potentially-ineligible-voters.

Russell's Muscogee County challenge uses passive language that suggests he did not conduct the alleged matching himself and, therefore, lacks personal knowledge of its accuracy. *See* Notice at 1 (stating that the "information *was gathered*" without identifying who performed the analysis) (emphasis added); Mayer Decl. ¶ 10.

**Second**, even if the match was performed in a reputable manner, the results are likely to include errors. A comparison of two datasets—like the NCOA registry and Georgia's voter registration file—to identify individuals appearing on both can only be performed through a specific process known as "record linkage," which requires a "unique identifier" for accuracy. Mayer Decl. ¶ 12. Without a unique identifier, record linkage "quickly becomes error-prone" and "can easily result in false matches, where an individual in one file will be incorrectly linked to a *different* individual in the other." *Id.* There is no unique identifier that exists in *both* the Georgia voter file and the NCOA registry. *Id.*

Because the challengers provided absolutely no information on how the linkage was performed, the Boards have *no knowledge* of which data fields in the voter registration file and the NCOA registry were compared. The Muscogee list of challenged voters, for instance, includes an out of state address, but does not include Georgia addresses, meaning that "it is unclear whether the matches were generated using an address that appears in both the Georgia voter file and the NCOA registry." *Id.* Worse yet, the list includes several people who are *not even registered in Georgia. Id.* ¶ 14.

**Third**, NCOA data on its own is notoriously unreliable when it is misused to conduct "analyses" for which it is not equipped—or even permitted—to serve. According to the U.S. Postal Service, the express purposes of the NCOA registry include "[r]educ[ing] undeliverable mail by providing the most current address information" for individuals, "[p]rovid[ing] faster

product/service marketing through accurate mail delivery," and "[r]educing mailer costs by reducing the number of undeliverable mail pieces."[5] Organizations that purchase licenses to access the NCOA registry are reminded that "the *sole purpose* of the NCOALink Product is to update Mailing Lists in preparation for delivery by the USPS."[6] Organizations that use the NCOA registry for other purposes are subject to significant fees and "consent[] to such injunctive, equitable or other monetary relief as a court of competent jurisdiction may deem proper."[7] According to commercial firms that rely on the NCOA registry, even when the data is used for its authorized, limited purpose, "false matches—someone who has not moved, but still appears on the NCOA registry—'do happen on a regular basis.'" Mayer Decl. ¶ 3 n.1.

When used to intimidate and target voters, NCOA data errors cause far more than mail delays; they lead to unjust disenfranchisement of duly qualified voters. In fact, a federal judge recognized just days ago that Georgia's prior reliance on NCOA data to remove individuals from the voter rolls likely resulted in mistaken cancellations of lawful, eligible voters. *See* Order, *Black Voters Matter Fund v. Raffensperger*, No. 1:20-CV-04869-SCJ (N.D. Ga. Dec. 16, 2020), ECF 63 at 30.

**Finally**, even if the challenge lists *were* accurate representations of registered voters who have forwarded their mail to an address out of state—to be clear, they are not—that would reveal nothing about the voters' eligibility. The challengers offer no evidence that these voters have

---

[5]     *NCOALink*, U.S. Postal Service, https://postalpro.usps.com/mailing-and-shipping-services/NCOALink, (last visited Dec. 24, 2020).

[6]     *Reminder on the Sole Purpose of NCOALink*, U.S. Postal Service (Nov. 19, 2020), https://postalpro.usps.com/NL_Sole_Purpose_Reminder (emphasis added).

[7] *Id.* It is unclear whether True the Vote or Russell have paid the license fee to access NCOALink (an annual license costs over $200,000), but if so, they may be doubly in violation of the NCOA License Agreement, which states that "addresses obtained as a result of the NCOALink process cannot be shared with parties outside of your organization." *Id.* (citing NCOALink License Agreement §§ 13.6-13.7).

actually "removed to another state with the intention of making the new state their residence," Notice at 1-2, as opposed to any of the countless other reasons why they may receive mail out of state while maintaining their Georgia address as their permanent residence.

Because NCOA data makes no mention of *why* any individual requested a change of mailing address, which would be critical for any threshold determination of the voter's eligibility, *see* Mayer Decl. ¶ 22, the challenges betray their own inadequacies. For example, the Muscogee list includes nearly 1,530 individuals whose NCOA forwarding address is on or near a major military installation and at least 244 voters with forwarding addresses in close proximity to major universities. *Id.* ¶ 23.

Unsurprisingly given the severe inadequacy of the methods used to generate the names of Targeted Voters, a cursory review of the challenge lists identified several individuals who plainly are eligible to vote at their registered address. These individuals have been compelled to spend their holidays trying to figure out why they have been challenged and how to ensure their vote will be counted—if they do not give up on voting altogether. The lists include a 67-year-old retired veteran—and lifelong Georgia resident—temporarily assigned to California for his employment as a government contractor with the United States Navy. *See* Declaration of Gamaliel Warren Turner, Sr., ("Turner Decl."), Ex. 3. They include a recent graduate of Auburn University who always intended to return—and now has returned—to permanently reside in Georgia. *See* Declaration of Scott Berson, Ex. 4. They include a Muscogee County homeowner who misplaced her wallet during a short trip to visit a friend in Colorado earlier this year, and who changed her mailing address merely to ensure she would receive a replacement debit card at her friend's residence as quickly as possible. *See* Declaration of Nakeitha Essix ("Essix Decl."), Ex. 5. And as was easily anticipated, the challenge lists also include military voters, *see* Declaration of Stephanie

Pfeiffer Stinetorf, Ex. 6 and Declaration of Angel Luna Colon ("Colon Decl.), Ex. 7, and individuals who share a name with someone in their household who has moved, *see* Declaration of Gerald Williams, Ex. 8. For completely innocent reasons, these voters and others like them have been snagged in the net of massive, undifferentiated, and unlawful challenges.

### E. The Boards refuse to reject frivolous mass challenges despite lack of probable cause and place the burden on Targeted Voters to reprove their residency.

Encouragingly, the overwhelming majority of other Georgia counties that have considered identical coordinated mass challenges brought by individuals working in concert with True the Vote have swiftly and decisively refused to entertain them—this includes Bacon, Catoosa, Chatham, Clarke, Clayton, Cobb, Columbia, Dawson, Dekalb, Douglas, Floyd, Fulton, Glynn, Gwinnett, Hall, Henry, Houston, Jackson, Lowndes, Marion, Paulding, Polk, Richmond, Taliaferro, and Union Counties. The Muscogee and Ben Hill Boards, however, chose to lend credibility to this blatant coordinated effort at voter intimidation and suppression.

On December 23, 2020, the Ben Hill Board held a hearing to consider the mass challenge and voted 2-1 to find the challenge was supported by probable cause with respect to 152 voters whom, according to the challenger's list, purportedly had out-of-state addresses. Those Targeted Voters' statuses will be marked as "pending hearing" and they will be mailed notices informing them that they will only be permitted to cast provisional ballots, which will not be counted unless cured by January 8 with proof of residence.

The Muscogee Board held its meeting on December 16, 2020 and, in a 3-1 vote, erroneously concluded that there was probable cause to support the challenge.[8] Notably, the Board recognized the insufficiency of the evidence presented before it and exempted any individuals on

---

[8] Tim Chitwood, *Columbus Republican leader files challenge to thousands of voters with out of state addresses*, Columbus Ledger-Inquirer (updated Dec. 17. 2020), https://www.ledger-enquirer.com/news/politics-government/election/article247890295.html.

the challenge list who were entitled to vote under the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) because the Board believed such individuals were more likely to change residences. Yet the Board inexplicably ignored all other perfectly reasonable explanations why voters may change their mailing addresses temporarily—including, for example, to attend school, for employment, or to care for a relative—while maintaining a permanent residence in Georgia. The Muscogee Board placed the names of the remaining Targeted Voters on a list and announced that if any individual on that list attempts to vote in person, the individual will be given notice of the challenge and will be forced to vote a provisional ballot that may be cured on an expedited timetable with evidence of residency. Thus, by accepting unlawful challenges based on unreliable and inaccurate data, the Boards have effectively placed a burden on voters to re-prove their eligibility, in direct conflict with Georgia law, which states that a registrar's approval of the Targeted Voter's existing registration "shall be *presumptive evidence* of a person's residence for voting purposes." O.C.G.A. § 21-2-217(b) (emphasis added).

## III.    ARGUMENT

Plaintiffs are entitled to a temporary restraining order because they have shown "(1) a substantial likelihood of ultimate success on the merits; (2) the TRO is necessary to prevent irreparable injury; (3) the threatened injury outweighs the harm the TRO would inflict on the non-movant; and (4) the TRO would serve the public interest." *Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995) (per curiam).

### A.  Plaintiffs are likely to succeed on the merits.

#### 1.  Plaintiffs' NVRA claims.

The NVRA restricts purging registration rolls for change-of-address and plainly preempts the challenge hearings that the Boards have ordered for that very purpose. The consequence of a

successful voter challenge under O.C.G.A. § 21-2-230 is removal from the registration rolls. *See* O.C.G.A. §§ 21-2-230(f), (g), (h). Because these challenges threaten the registration status of the Targeted Voters, they must comply with procedures set forth by the NVRA. But here, to the contrary, the Boards' actions violate the NVRA twice over.

### a. Section 8(d) claim.

Section 8(d) prohibits the Boards from acting on these mass challenges. It expressly prohibits election officials from "*remov[ing]* the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant changed residence *unless*" the officials follow procedures set out therein, requiring that: (1) the Board receive written confirmation from the voter of change of address, or (2) the voter fails to respond to a postcard notice, and also fails to vote in at least two subsequent federal general election cycles. 52 U.S.C. § 20507(d)(1) (emphasis added). The challengers do not allege—and the Boards have no reason to believe—that either of these two preconditions are met. Therefore, the residency-based purge that the challengers demand is forbidden.

This is far from a novel position. In similar cases evaluating voter list maintenance procedures, courts have routinely determined that the removal procedures set out in Section 8(d) of the NVRA are unequivocal. *See, e.g., Schmitz v. Fulton Cnty. Bd. of Registration & Elections*, 2020CV339337 (Super. Ct. Ga. Oct. 1, 2020), appeal transferred to Ga. S. Ct. Dec. 21, 2020 (denying request under O.C.G.A. §§ 21-2-229 and 21-2-230 for immediate hearings on mass voter challenges based on change-of-address data in part because removal of challenged voters was prohibited by the NVRA); *Common Cause Ind. v. Lawson*, 937 F.3d 944, 959 (7th Cir. 2019) (explaining NVRA "forbids" removal of voter for residency reasons outside of procedures set out therein); *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 381 (6th Cir. 2008) (holding "[s]tates

13

may not remove 'registrants'" from voter rolls based on change in residence unless the NVRA procedures are met).

These same principles have also been applied to challenge cases markedly similar to this one, with courts finding that removing voters for residency reasons pursuant to a state-authorized elector challenge violates the NVRA where the statutory procedures are not followed. *See N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, 1:16CV1274, 2018 WL 3748172, at *8 (M.D.N.C. Aug. 7, 2018) (finding three counties violated Section 8 of NVRA by removing voters from voter rolls on residency grounds during federal election cycle without adhering to the process set out therein); *Mont. Democratic Party v. Eaton*, 581 F. Supp. 2d 1077, 1082 (D. Mont. 2008) ("Because the federal [NVRA] makes it illegal to deny an elector his or her vote based on a change of address, subject to limited exceptions not implicated here, if Montana county election officials are required, or even allowed, to compel an elector challenged on the basis of change-of-address information to prove anything, there is a violation of federal law."). For this very reason, rather than litigate a challenge case, another Georgia county, Hancock, recently entered into a consent decree acknowledging that the NVRA governed its removal of several voters from the voter rolls pursuant to a challenge. *Ga. State Conf. of NAACP v. Hancock Cnty. Bd. of Elections & Registration*, 5:15-CV-00414 (CAR), 2018 WL 1583160, at *1 (M.D. Ga. Mar. 30, 2018) (granting joint consent decree requiring Hancock County to follow NVRA procedures for residency-based voter removal and establishing five-year monitoring).

The challenges did not allege that a single Targeted Voter confirmed a change of address in writing to the Board or received official notice from the Board and failed to vote in two subsequent general elections. Accordingly, the NVRA prohibits the removal of any Targeted Voter from the registration rolls based on broad-based, indiscriminate challenges based on list-matching

efforts, and preempts any state law that would provide otherwise. The only lawful response a board

of elections may take in response to these challenges is to deny them immediately.

      **b.  Section 8(c) claim.**

Even if Section 8(d) of the NVRA did not preclude the challenge hearings the Board has

ordered, Section 8(c) would do so because the challenges were made within 90 days of a federal

election and failed to provide the necessary individualized inquiry to protect Georgians' right to

vote. Section 8(c) provides that "[a] State shall complete, not later than 90 days prior to the date

of a primary or general election for Federal office, any program the purpose of which is to

systematically remove the names of ineligible voters from the official lists of eligible voters." 52

U.S.C. § 20507(c)(2)(A). This provision has been interpreted to apply not just to regular voter list

maintenance programs, but also to voter challenges like those advanced here. For example, a North

Carolina federal court recently reviewed voter challenges across four counties and found that,

where a county's removal of voters "lack[s] individualized inquiry," rests on "generic evidence"

such as mass mailings, and occurs within 90 days of a federal election, it violates Section 8(c) of

the NVRA. *See N.C. State Conf. of NAACP*, 2018 WL 3748172, at *6-7. The court relied heavily

on the Eleventh Circuit's NVRA analysis in *Arcia v. Florida Secretary of State*, 772 F.3d 1335,

1346 (11th Cir. 2014), which held that "the NVRA's prohibition on systematically removing voters

within 90 days of the general election 'is designed to carefully balance these four competing

purposes in the NVRA . . . by limiting its reach to programs that 'systematically' remove voters

from the voter rolls' but allowing removals 'based on individualized information at any time.'"

*N.C. State Conf. of NAACP*, 2018 WL 3748172, at *6 (quoting *Arcia*, 772 F.3d at 1346).

The 90-day cutoff exists to protect voters from precisely the predicament that confronts the

Muscogee and Ben Hill County residents whose names appeared on the challenge lists: while

> [a]t most times during the election cycle, the benefits of systematic programs outweigh the costs because eligible voters who are incorrectly removed have enough time to rectify any errors[,] . . . [e]ligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote.

*Arcia*, 772 F.3d at 1346. Here, the mass challenges were filed mere weeks before the January 5 runoff elections and well within the 90-day quiet period; the NVRA prohibits the Boards from acting on such challenges on the eve of an election.

### 2. Plaintiffs' Right-to-Vote claim.

The Boards' actions severely burden the right to vote by imposing unjustifiable barriers to casting a ballot in the impending Senate runoff elections, in violation of the First and Fourteenth Amendments. Under the *Anderson-Burdick* balancing test, the Supreme Court requires courts to "weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,'" considering "'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983)). Courts apply a "flexible standard," *id.*—that is, "[t]he more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318, 1319 (11th Cir. 2019).

When voting rights are severely restricted, the government's actions "must be narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 280 (1992). But even less severe burdens remain subject to balancing: "However slight" the burden may appear, "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (controlling op.) (quoting *Norman*, 502 U.S. at 288–89). Complete disenfranchisement is—

obviously—a "severe" burden. *See Lee*, 915 F.3d at 1321 ("[I]t is a 'basic truth that even one disenfranchised voter—let alone several thousand—is too many.'") (quoting *League of Women Voters of N.C. v. North Carolina* ("*LWV NC*"), 769 F.3d 224, 244 (4th Cir. 2014)); *Fla. Democratic Party v. Detzner*, No. 4:16cv607-MW/CAS, 2016 WL 6090943, at *6 (N.D. Fla. Oct. 16, 2016) ("If disenfranchising thousands of eligible voters does not amount to a severe burden on the right to vote, then [it is not clear] what does.").

The Boards' decision to entertain these challenges threatens thousands of voters with the severe burden of disenfranchisement, which they cannot justify through any government interest. Thousands of duly-qualified voters who timely registered to vote in the runoffs will be (and already have been) forced to cast provisional ballots that may not count unless they can rapidly muster documentary proof of residence. *See, e.g.*, Essix Decl. Some Targeted Voters are likely temporarily located away from their primary residence and re-proving their eligibility to vote on short notice will be difficult, and in some cases, impossible. *See, e.g.*, Turner Decl., Colon Decl. Further, if the challenges against them are upheld, Targeted Voters will be removed entirely from the registration lists and disenfranchised as a result. *See, e.g.*, O.C.G.A. § 21-2-230(h).

To be sure, voters need not be wholly disenfranchised to suffer an unconstitutional burden on their right to vote. *See, e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012); *League of Women Voters of Fla., Inc. v. Detzner*, 354 F. Supp. 3d 1280, 1288 (N.D. Fla. 2018) ("[A] voter need not have been effectively disenfranchised to state a claim under *Anderson-Burdick*."); *cf. Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) ("The inability of a voter to pay a poll tax . . . is not required to challenge a statute that imposes a tax on voting.") (citing *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 668 (1966)). The mere act of challenging these voters is a well-documented voter intimidation tactic that will discourage qualified Georgia

voters from exercising their right to vote. "Voters might be intimidated, confused, or even discouraged from voting upon receiving notice that their right to vote—the most precious right in a government of, by, and for the people—has been challenged." *Eaton*, 581 F. Supp. 2d at 1079. Additionally, voter-eligibility challenges impose "significant costs on registrants" in the form of administrative burdens that "reduce the likelihood that a person votes." Mayer Decl. ¶ 27.

The Boards plainly have no legitimate interest in entertaining meritless challenges without any showing of probable cause that justifies the burden on voters. County voter registrars *already* engage in routine efforts to confirm whether voters who file an NCOA card with the U.S. Postal Service are in fact ineligible to remain registered and vote.[9] However, Georgia law requires election officials to undergo a multi-step process before removing any voter from the registration list unless the voter affirmatively confirms their ineligibility to election officials. *See* O.C.G.A. § 21-2-233(c) (implementing NVRA requirements).[10] While the State may possess an interest in preventing actual voter fraud, that interest plainly cannot justify adopting a presumption—only a few weeks before an election—that thousands of Georgians are ineligible to vote unless they prove otherwise, merely because they have temporarily forwarded their mail.

Further, the Boards surely have no interest in taking actions that conflict with state law. Under the *Anderson-Burdick* framework, courts only consider "relevant and *legitimate* [government] interests," *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1318-19 (emphasis added). A challenge filed under O.C.G.A. § 21-2-230 "*shall be denied*" if no "probable cause exists to sustain such challenge." *Id.* (emphasis added). "Probable cause" is a well-defined legal term that

---

[9] *2019 List Maintenance*, Georgia Sec. of State,
https://sos.ga.gov/index.php/elections/2019_list_maintenance, (last visited Dec. 24, 2020).
[10] *See 2019 List Maintenance*, *supra* note 9 (describing multi-step statutory process requiring "personalized notice" and prolonged mandatory waiting periods).

requires "a reasonable ground for belief"—that is, "something more than mere suspicion." *United States v. Cleckler*, 270 F.3d 1331, 1334 (11th Cir. 2001). "Rumor, suspicion, speculation or conjecture is not sufficient to show probable cause." *Zimmerman v. State*, 207 S.E.2d 220, 222 (Ga. App. 1974). Probable cause must be "individualized," *Autry v. State*, 626 S.E.2d 528, 531 (Ga. App. 2006), and "particularized with respect to that person," *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

By any standard, the Boards should not have determined probable cause existed to sustain this mass challenge because no evidence was offered that could possibly meet that threshold. As described in detail *supra* at Part II.D.: (1) the challenges provide absolutely no explanation of the methodology used to compare of registration lists against the NCOA registry, making it impossible to determine the reliability of the match lists; (2) the Georgia voter file and the NCOA registry have no common unique identifier, meaning the list almost certainly includes false matches; (3) several names on the challenge lists are not even registered in Georgia; and (4) NCOA data, even when accurate, reveals nothing about a voter's eligibility; it is neither equipped nor even offered for that purpose, and Defendants' reliance on the challenged lists will most certainly lead to mistaken disenfranchisement or undue burdens imposed on lawful, eligible voters.

**B. Plaintiffs will suffer irreparable harm absent a temporary restraining order.**

The Boards' actions put Targeted Voters and others at risk of disenfranchisement, which undeniably constitutes irreparable harm. If "constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am.*, 697 F.3d at 436; *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1346 (N.D. Ga. 2018) ("[T]the disenfranchisement of the right to vote is an irreparable injury and one that cannot easily be redressed."). Once the election occurs, "there can be no do-over and no redress." *LWOV NC*, 769 F.3d at 247. These actions also

restrict Majority Forward's ability to mobilize and turnout voters for the runoff elections—the type injury to election-related activities that courts routinely recognize as irreparable harm, *see Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1350 (N.D. Ga. 2016); *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012)—and force Majority Forward to divert resources toward the costly, time-intensive endeavor of identifying and assisting voters who have wrongfully been targeted. *See* Declaration of JB Poersch, Ex. 9.

### C. The balance of the equities and the public interest favor a temporary restraining order.

The remaining TRO factors weigh strongly in favor of granting the requested injunction. Absent immediate relief, Plaintiff Turner and thousands of voters face impingement on their constitutional right to vote as they will be forced to either incur the burden of re-proving their eligibility or risk disenfranchisement. Defendants, on the other hand, seek to take actions that are unauthorized under state and federal law, and have made probable cause determinations based on inconclusive, inaccurate, and unreliable data from unknown sources. In fact, a TRO would alleviate the administrative burden of resolving frivolous challenges to quite literally thousands of eligible voters. And, "[b]y definition, the public interest favors permitting as many qualified voters to vote as possible," and "upholding constitutional rights serves the public interest." *Ga. State Conf. of NAACP v. Georgia*, No. 1:17-CV-1397-TCB, 2017 WL 9435558, at *5 (N.D. Ga. May 4, 2017) (quoting *LWV NC*, 769 F.3d at 247); *see Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1310-11 (N.D. Ga. 2018) ("[T]he public interest is best served by allowing qualified absentee voters to vote and have their votes counted.").

### IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court grant their motion for a temporary restraining order.

Dated: December 27, 2020                    Respectfully submitted,

*/s/ Adam M. Sparks*
Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
KREVOLIN AND HORST, LLC
One Atlantic Center
1201 W. Peachtree Street, NW,
Ste. 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
hknapp@khlawfirm.com
jlewis@khlawfirm.com
sparks@khlawfirm.com


Marc E. Elias*
Uzoma Nkwonta*
Jacob D. Shelly*
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 800
Washington, DC 20005
(202) 654-6200

*Attorneys for Plaintiffs*
**Pro hac vice applications* forthcoming

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

| | |
|---|---|
| MAJORITY FORWARD, et al., <br><br> Plaintiffs, <br><br> v. <br><br> BEN HILL COUNTY BOARD OF ELECTIONS, et al., <br><br> Defendants. | Case No. 1:20-cv-00266-LAG |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 27, 2020, I caused a copy of the foregoing documents to be electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record, and by electronic mail to the following:

Nicholas Andrew Kinsley
Hall Booth Smith PC
1564 King Road
Tifton, GA 31793
nkinsley@hallboothsmith.com

Dated: December 27, 2020.

*/s/ Adam M. Sparks*
Adam M. Sparks
*Attorney for Plaintiffs*