# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### ALBANY DIVISION

MAJORITY FORWARD; GAMALIEL
WARREN TURNER, SR.; and DEBRA
LEWIS,

                Plaintiffs,

v.

BEN HILL COUNTY BOARD OF
ELECTIONS; CINDI DUNLAP, in her official
capacity as Ben Hill County Elections
Supervisor and Chief Registrar; THOMAS
GREEN, in his official capacity as MEMBER
of the Ben Hill County Board of Elections;
DAVID WALKER, in his official capacity as
MEMBER of the Ben Hill County Board of
Elections; DANNY YOUNG, in his official
capacity as MEMBER of the Ben Hill County
Board of Elections; GUDRUN MILLS, in his
official capacity as MEMBER of the Ben Hill
County Board of Elections; PENSON
KAMINSKY, in his official capacity as
MEMBER of the Ben Hill County Board of
Elections; MUSCOGEE COUNTY BOARD
OF ELECTIONS AND REGISTRATION;
NANCY BOREN, in her official capacity as
Muscogee County Director of Elections &
Registration; MARGARET JENKINS, in her
official capacity as MEMBER of the Muscogee
County Board of Elections and Registration;
UHLAND ROBERTS, in his official capacity
as MEMBER of the Muscogee County Board
of Elections and Registration; DIANE
SCRIMPSHIRE, in her official capacity as
MEMBER of the Muscogee County Board of
Elections and Registration; LINDA PARKER,
in her official capacity as MEMBER of the
Muscogee County Board of Elections and
Registration; and ELEANOR WHITE, in her
official capacity as MEMBER of the Muscogee
County Board of Elections and Registration,

                Defendants.

**AMENDED COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**


**No. 1:20-cv-00266-LAG**

## INTRODUCTION

1.      Plaintiffs Majority Forward, Gamaliel Warren Turner, Sr., and Debra Lewis bring this emergency action for injunctive and declaratory relief to protect the rights of voters in Ben Hill County and Muscogee County who have been subjected to frivolous mass challenges in advance of the January 5, 2021 runoff elections. These flagrant and partisan attempts at voter suppression are part of a well-publicized attack on over 360,000 voters across the State of Georgia, initiated by True the Vote, a Texas-based organization, which has partnered with challengers in Ben Hill, Muscogee, and other counties to submit lists of registered voters whose names purportedly appear in the United States Postal Service's National Change of Address ("NCOA") database. What they fail to mention is that NCOA matching is notoriously unreliable and the appearance of a voter's name on an NCOA list cannot provide the basis for a lawful challenge to a voter's eligibility. In fact, federal law and the United States Constitution prohibit election officials from rejecting or imposing additional burdens on voters when presented with such inconclusive and unreliable data.

2.      Other counties have correctly identified True the Vote and their affiliates' attempt at mass disenfranchisement for what it is and rejected their challenges accordingly. But the Ben Hill County Board of Elections and Registration (the "Ben Hill Board") and the Muscogee County Board of Elections and Registration (the "Muscogee Board") (collectively, the "Boards") inexplicably chose a different (and unlawful) path, finding probable cause to sustain the broad, indiscriminate challenge to many of the more than 4,000 targeted registered voters ("Targeted Voters") in the counties, who must now cast a provisional or challenged ballot in the January 5 runoff election and incur the additional burden of re-establishing their eligibility to vote.

3.      The Boards' decisions effectively endorse True the Vote's widespread campaign of misinformation and attempts at disenfranchisement and is plainly contrary to settled law. Because

NCOA data alone cannot supply probable cause to support a challenge under Georgia law, the challenges must be denied immediately. Jeopardizing any individual's right to vote on the basis of NCOA data in this manner is also expressly prohibited by the National Voter Registration Act, and it is doubly forbidden this close to an election for federal office. Even more, the Boards' actions violate the First and Fourteenth Amendments of the federal Constitution because they unduly burden the right to vote.

4.      This is not a question of first impression. Such sordid attempts at political gamesmanship—ambushing elections officials on the eve of an election, demanding the disqualification of binders full of names based on inaccurate and otherwise innocuous data—has been tried before. Whatever the propriety of the individuals bringing the challenge, courts have unequivocally recognized that the only lawful action boards of elections may take in response is to immediately reject such challenges.

5.      When election officials fail to heed this warning, the danger is plain: "One can imagine the mischief an immature political operative could inject into an election cycle were he to use the [challenge] statutes, not for their intended purpose of protecting the integrity of the people's democracy, but rather to execute a tawdry partisan ploy." *Mont. Democratic Party v. Eaton*, 581 F. Supp. 2d 1077, 1079 (D. Mont. 2008). "Voters might be intimidated, confused, or even discouraged from voting upon receiving notice that their right to vote—the most precious right in a government of, by, and for the people—has been challenged." *Id.*

6.      This mischief is no longer imaginary in Ben Hill County or Muscogee County. Challenged voters who are notified that their qualifications have been questioned will face a daunting dilemma: They can quickly marshal documentation and defend their eligibility at an official hearing or other proceeding; or, if they are unable to prove continuing residency at their

address of registration quickly and persuasively, they risk being erased from the registration rolls and having any ballot cast in the January 5 elections discarded. Defending one's rights before a quickly scheduled government hearing is always a burden, *especially* during the holidays, *especially* during a pandemic, and *especially* for any Targeted Voters who are temporarily out of state, which may have resulted in their wrongful inclusion on the challenge list in the first place. Some voters may have the time and resources to rebut the challenge, while others will not. In either case, confusion, discouragement, or wrongful disenfranchisement will result.

7.     The Boards must immediately reject these unlawful attempts at voter intimidation that have been perpetrated by mass challenges to over 300 registered voters in Ben Hill County, over 4,000 registered voters in Muscogee County, and over 360,000 other individuals across Georgia.[1] Plaintiffs hereby seek emergency relief to ensure that the right to vote is not burdened or denied in direct contravention of federal law. Specifically, Plaintiffs seek an order enjoining the Boards from taking any further action on these frivolous challenges or otherwise preventing the Targeted Voters from casting a regular ballot in the January 5, 2021 runoff.

## PARTIES

8.     Plaintiff MAJORITY FORWARD is a not-for-profit 501(c)(4) organization created to support voter registration and voter turnout efforts. Its primary mission is to encourage full participation by voters in our election process. Majority Forward has made, and will continue to make, millions of dollars in contributions and expenditures to educate, mobilize, and turn out voters in Georgia for the United States Senate elections. Majority Forward's funds help to pay for

---

[1] *True the Vote Partners with Georgians in Every County to Preemptively Challenge 364,541 Potentially Ineligible Voters*, True the Vote (Dec. 18, 2020), https://truethevote.org/true-the-vote-partners-with-georgians-in-every-county-to-preemptively-challenge-364541-potentially-ineligible-voters.

organizers on the ground across Georgia, who work with local activists and organizations on projects designed to engage activists and voters in the political process. Majority Forward's sustained and integrated mobilization program also includes digital, direct mail, and radio efforts across Georgia, including in Muscogee County, to urge voters to participate in the January runoff elections. Because of the mass voter challenges, Majority Forward will have to divert resources and attention away from these mobilization and persuasion activities to focus on identifying voters who have wrongfully been targeted and assisting these voters to navigate the challenge process and ensure their votes are counted. Because voter intimidation efforts like these mass challenges dissuade registered voters from participating in elections, Majority Forward also will have to divert resources to convince qualified voters that their participation remains lawful. Accordingly, the mass challenges directly frustrate Majority Forward's ability to achieve its mission.

9.    Plaintiff GAMALIEL WARREN TURNER, SR., is a permanent Georgia resident and a registered voter in Muscogee County. Mr. Turner is a government contractor who removed to California, for temporary purposes only, to engage in employment with the United States Navy. Mr. Turner is a Targeted Voter and his absentee ballot request has been marked as "challenged." Mr. Turner has not received any instructions regarding how to prove his eligibility to vote in the January runoff elections.

10.    Plaintiff Debra Lewis is a permanent Georgia resident and a registered voter in Ben Hill County. In 2018 and 2019 Ms. Lewis regularly traveled between her permanent residence in Georgia and her boyfriend's residence in Missouri. In 2019, to save her friends the trouble of forwarding her mail while she was away, she temporarily changed her mailing address to her boyfriend's residence in Missouri. In October 2020, she changed her mailing address back to her permanent residence in Georgia. Ms. Lewis is a Targeted Voter and she was not permitted to cast

a regular ballot when she attempted to vote on December 28, 2020. *See* Exhibit 1, Declaration of Debra Lewis.

11.     Defendant BEN HILL COUNTY BOARD OF ELECTIONS AND REGISTRATION is the political subdivision empowered with the powers and duties of the board of registrars relating to the registration of voters and absentee-balloting procedures for Ben Hill County's unified government, including maintaining the list of qualified voters for Ben Hill County. *See* O.C.G.A. § 21-2-40(b).

12.     Defendant CINDI DUNLAP is the Ben Hill County Elections Supervisor and Chief Registrar, and she is sued in her official capacity.

13.     Defendant THOMAS GREEN is a member of the Ben Hill County Board of Elections, and he is sued in his official capacity.

14.     Defendant DAVID WALKER is a member of the Ben Hill County Board of Elections, and he is sued in his official capacity.

15.     Defendant DANNY YOUNG is a member of the Ben Hill County Board of Elections, and he is sued in his official capacity.

16.     Defendant GUDRUN MILLS is a member of the Ben Hill County Board of Elections, and he is sued in his official capacity.

17.     Defendant PENSON KAMINSKY is a member of the Ben Hill County Board of Elections, and he is sued in his official capacity.

18.     Defendant MUSCOGEE COUNTY BOARD OF ELECTIONS AND REGISTRATION is the political subdivision empowered with the powers and duties of the board of registrars relating to the registration of voters and absentee-balloting procedures for Columbus-

Muscogee County's unified government, including maintaining the list of qualified voters for Muscogee County. *See* O.C.G.A. § 21-2-40(b).

19.     Defendant NANCY BOREN is the Muscogee County Director of Elections & Registration, and she is sued in her official capacity.

20.     Defendant MARGARET JENKINS is a member of the Muscogee County Board of Elections and Registration, and she is sued in her official capacity.

21.     Defendant UHLAND ROBERTS is a member of the Muscogee County Board of Elections and Registration, and he is sued in his official capacity.

22.     Defendant DIANE SCRIMPSHIRE is a member of the Muscogee County Board of Elections and Registration, and she is sued in her official capacity.

23.     Defendant LINDA PARKER is a member of the Muscogee County Board of Elections and Registration, and she is sued in her official capacity.

24.     Defendant ELEANOR WHITE is a member of the Muscogee County Board of Elections and Registration, and she is sued in her official capacity.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this case because the action arises under the laws and Constitution of the United States. 28 U.S.C. §§ 1331, 1343.

26.     Because Plaintiffs are aggrieved by a violation of the NVRA, they may bring a civil action in this Court for declaratory or injunctive relief with respect to the violation. 52 U.S.C. § 20510(b). Plaintiffs were not required to provide written notice of the violation to the Secretary

of State because the violation "occurred within 30 days before the date of an election for Federal office." *Id.* § 20510(b)(3).

27.     This Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

28.     Venue is proper in the Middle District of Georgia under 28 U.S.C. § 1391, and in the Albany Division under Local Civ. R. 3.4, because several Defendants reside in this district and division, and many of the events or omissions giving rise to the claim occurred within this district and division.

## FACTUAL BACKGROUND

### A.  Residency Rules for Georgia Voters.

29.     The Georgia Constitution guarantees the "[r]ight to register and vote." Ga. Const. art. II, § 1, ¶ II. "Every person who is a citizen of the United States and a resident of Georgia as defined by law, who is at least 18 years of age and not disenfranchised by this article, and who meets minimum residency requirements as provided by law shall be entitled to vote at any election by the people. The General Assembly shall provide by law for the registration of electors." *Id.*

30.     Pursuant to this constitutional guarantee, the Georgia General Assembly has established a comprehensive set of rules for "determining the residence of a person desiring to register to vote . . . ." O.C.G.A. § 21-2-217(a).

31.     When "determining a voter's qualification to register and vote" upon receiving a registration application, a registrar must consider any "relevant circumstances" to determine the applicant's residence. O.C.G.A. § 21-2-217(b). Once an individual is registered, the determination

of residency made by the registrar "shall be *presumptive evidence* of a person's residence for voting purposes." *Id.* (emphasis added).

32.     Georgia law establishes many rules that must be followed in determining residency. O.C.G.A. § 21-2-217(a). Most of these rules identify circumstances in which a person "shall" or "shall not" "be considered to have lost [their] residence in this state" or when an address "shall be deemed the person's residence address." *Id.* at (11), (14).

33.     Whether a voter's name appears in the National Change of Address database or whether the voter has sought to forward mail is *not* among the reasons that a person shall be considered to have lost residence in the state or county. At most, "the board of registrars . . . *may* consider evidence of where the person receives significant mail such as personal bills and any other evidence that indicates where the person resides," but such evidence is not conclusive like other rules. O.C.G.A. § 21-2-217(a)(15) (emphasis added).

34.     In fact, several rules contemplate permissible circumstances in which voters could change their mailing address, but nevertheless "*shall not* be considered to have lost [their] residence . . . ." O.C.G.A. § 21-2-217(a)(2) (emphasis added). These reasons include: moving for temporary purposes, O.C.G.A. § 21-2-217(a)(2); attending a college or university, O.C.G.A. § 21-2-217(a)(8); moving to engage in government service, O.C.G.A. § 21-2-217(a)(11); and intending to move without actually moving, O.C.G.A. § 21-2-217(a)(9).

35.     Georgia law also permits citizens who begin residence in another state within 30 days of an election to vote in Georgia if the person is not admitted to vote in the new state. *See* O.C.G.A. § 21-2-216(e). State law also instructs that "an elector who moves from one county or municipality to another after the fifth Monday prior to a primary or election may vote in the county or municipality or precinct in which such elector is registered to vote." O.C.G.A. § 21-2-218(e).

36.     Federal law requires Georgia to permit voting and registration by absent uniformed voters and overseas voters who are, by definition, located outside of the state. *See* 52 U.S.C. § 20302(a)(1), (2).

37.     Thus, any Georgia voters who temporarily relocated during the pandemic to be closer to family or care for someone ill, or who moved for a few months to take college classes, or to work a summer job, or for any other number of perfectly valid reasons, may request to receive mail at an address other than where they registered to vote without forfeiting their right to vote in the county where they are registered.

38.     There is nothing irregular or unusual about voting while outside of one's voting jurisdiction; indeed, the availability of absentee voting accommodates exactly that. *See* O.C.G.A. § 21-2-380(b).

**B.  Federal Law Establishes Procedures for Removing Voters from Registration Lists Following a Confirmed Change of Residence.**

39.     Challenging voter eligibility and removing voters from registration lists close to an election carries a significant risk of disenfranchisement, as erroneously purged voters may be unable to re-register or re-establish their eligibility in time to cast a ballot.

40.     Accordingly, the National Voter Registration Act requires that "[a] State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A).

41.     This prohibition on removing voters from registration lists within 90 days of an election extends to both regular list maintenance programs and mass voter challenges. *See, e.g.*, *Schmitz v. Fulton Cnty. Bd. of Registration & Elections*, No. 2020CV339337 (Super. Ct. Ga. Oct. 1, 2020), attached as Exhibit A, appeal transferred to Ga. S. Ct. Dec. 21, 2020; *N.C. State Conf. of*

*NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, No. 1:16CV1274, 2018 WL 3748172, at \*4-
\*5 (M.D.N.C. Aug. 7, 2018); *Mont. Democratic Party*, 581 F. Supp. 2d at 1081.

42.     Voting while outside of one's voting jurisdiction is such a common occurrence that
federal law places strict limitations on a State's authority to cancel a voter's registration—and
thereby prevent the voter from casting a regular ballot—due to a purported address change.

43.     The National Voter Registration Act prohibits the removal of individuals from voter
registration lists unless strict procedures are followed. Specifically, "[a] State ***shall not remove*** the
name of a registrant from the official list of eligible voters in elections for Federal office on the
ground that the registrant has changed residence ***unless***" it follows the procedures set out therein,
which require that: (1) the State receive written confirmation from the voter of change of address,
or (2) the voter fails to respond to a postcard notice, and also fails to vote in at least two subsequent
federal general election cycles. 52 U.S.C. § 20507(d)(1) (emphasis added).

44.     Georgia law implements these federal requirements through strict procedures for
removing voters on the basis of "change of address information supplied by the United States
Postal Service," also known as the National Change of Address (NCOA) registry. *See* O.C.G.A.
§ 21-2-233(c). Under these rules it is not enough that a voter's name appears on the NCOA
registry. Before a voter may be removed from the rolls, the voter must also receive written notice
and a) provide state elections officials with affirmative confirmation that the voter has, in fact,
moved, or b) fail to contact state elections officials during the period spanning two subsequent
November general elections. *See id.*; § 21-2-235.

### C. Voter Eligibility Challenges and Change of Address Information.

45.     Georgia law permits electors within a county to "challenge the right of any other
elector of the county . . . to vote in an election." O.C.G.A. § 21-2-230(a).

46.     Upon receipt of such a challenge, the board of registrars must "determine whether probable cause exists to sustain such challenge." O.C.G.A. § 21-2-230(b). "If the registrars do not find probable cause, the challenge *shall be denied*." *Id.* (emphasis added).

47.     A challenge alleging a change in residency amounts to a "challenge . . . based upon grounds that the challenged elector is not qualified to remain on the list of electors . . . ." O.C.G.A. § 21-2-230(g); *see, e.g.*, O.C.G.A. § 21-2-216(f) ("No person shall remain an elector longer than such person shall retain the qualifications under which such person registered."); O.C.G.A. § 21-2-217(a) (establishing rules for determining residency for the purpose of registration); O.C.G.A. § 21-2-218(a), (b) (establishing that permanently moving and registering to vote in another state or county results in cancellation of voter's registration in the former place of residence).

48.     "[I]f practical," the board is required to notify the challenged elector and afford the elector an opportunity to answer. O.C.G.A. § 21-2-230(b).

49.     If the challenged elector appears at the polling place to vote, the individual shall be given the opportunity to appear before the board and answer the grounds of the challenge. O.C.G.A. § 21-2-230(c). If it is not practical to conduct a hearing prior to the close of polls, the challenged elector shall be permitted to vote by casting a challenged ballot, which is equivalent to a provisional ballot. O.C.G.A. § 21-2-230(i). If the board upholds the challenge after holding a hearing, the challenged elector will not be permitted to vote, the provisional ballot will not be counted, and the challenged elector's name will be removed from the voting rolls. O.C.G.A. § 21-2-230(h), (i).

50.     If the challenged elector casts an absentee ballot, the board shall proceed to conduct a hearing on an expedited basis. If the board upholds the challenge, "the name of the challenged

elector shall be removed from the list of electors and the ballot of the challenged elector shall be rejected and not counted." O.C.G.A. § 21-2-230(g).

51.     If the challenged elector does not cast an absentee ballot and does not appear at the polling place to vote, the board of registrars shall proceed to hear the challenge under the provisions for challenging a voter's registration. O.C.G.A. § 21-2-230(f). After holding a hearing, the board will remove the challenged elector's name from the list of electors if the challenge is upheld. O.C.G.A. § 21-2-229(d).

   **D.  The National Change of Address Registry Is Inconclusive and Unreliable, and Cannot Support a Challenge to Voter Eligibility.**

52.     The National Change of Address (NCOA) registry is a dataset consisting of the names and addresses of individuals and businesses who have filed a change-of-address with the U.S. Postal Service.

53.     The purposes of the NCOA registry include "[r]educ[ing] undeliverable mail by providing the most current address information" for individuals, "[p]rovid[ing] faster product/service marketing through accurate mail delivery," and "[r]educing mailer costs by reducing the number of undeliverable mail pieces."[2]

54.     Organizations that purchase licenses to access the NCOA registry are reminded that "the sole purpose of the NCOALink Product is to update Mailing Lists in preparation for delivery by the USPS."[3]

---

[2] *NCOALink*, U.S. Postal Service, https://postalpro.usps.com/mailing-and-shipping-services/NCOALink (last visited Dec. 22, 2020).
[3] *Reminder on the Sole Purpose of NCOALink*, U.S. Postal Service (Nov. 19, 2020), https://postalpro.usps.com/NL_Sole_Purpose_Reminder.

55.     The NCOA License Agreement states that "addresses obtained as a result of the NCOALink process cannot be shared with parties outside of your organization."[4]

56.     Organizations that use the NCOA registry for other purposes are subject to significant fees and "consent[] to such injunctive, equitable or other monetary relief as a court of competent jurisdiction may deem proper."[5]

57.     NCOA data is a notoriously unreliable means of determining voter eligibility. For one, matching the NCOA database to a state voter registration file leads to perceived matches that are often inaccurate on their face; that is, it will misidentify voters.

58.     To give an example of how frequent false matches can be, the January 2020 Georgia voter file contains records for 7,057,248 unique voters. There are over 1 million duplicates with the same combination of first name, last name, and age out of roughly 7 million registrants, including 272,256 combinations present twice, 127,816 present three times, and 57,854 present 10 or more times.

59.     Additionally, NCOA data makes no mention of why any individual requested a change of address, a fact that is critical for any threshold determination of the voter's eligibility. Even if the NCOA database accurately tracked which individuals have moved—and it does not— the information still fails to reliably determine whether such individuals remain eligible to vote at the address where they are registered.

60.     There are a variety of reasons why a legal resident and voter in Georgia would appear on the NCOA registry for a temporary move out of state without losing Georgia voting

---

[4] *Id.* (citing NCOALink License Agreement §§ 13-6-13.7).
[5] *Id.*

residency. These may include students attending college out of state, military personnel, and business people and workers on temporary assignment.

61.     There is nothing sinister about a voter moving out of state and filing an NCOA form while maintaining legal residence in Georgia. That is precisely what absentee ballots are for. *See* O.C.G.A. § 21-2-380(b).

62.     According to the Georgia Secretary of State, county voter registrars already engage in routine efforts to confirm whether voters who file an NCOA card with the U.S. Postal Service are in fact ineligible to remain registered and vote.[6] However, Georgia law requires election officials to undergo an extensive multistep process before removing a voter from the registration list unless a voter affirmatively confirms his or her ineligibility with election officials. *See* O.C.G.A. § 21-2-233(c).[7]

63.     Due to the high risk of erroneous disenfranchisement when relying on NCOA data to purge voters, the Georgia Secretary of State insisted on implementing additional steps not required by statute before removing voters based on NCOA data last year.[8]

64.     In fact, a federal judge recognized just days ago that Georgia's prior reliance on NCOA data to remove individuals from the voter rolls likely resulted in mistaken cancellations of lawful, eligible voters. *See* Order at 30, *Black Voters Matter Fund v. Raffensperger*, No. 1:20-CV-04869-SCJ (N.D. Ga. Dec. 16, 2020), ECF 63.

---

[6] *2019 List Maintenance*, Georgia Sec'y of State, https://sos.ga.gov/index.php/elections/2019_list_maintenance.

[7] *See Id.* (describing multi-step statutory process requiring "personalized notice" and prolonged mandatory waiting periods).

[8] *See id.* ("Accurate and up-to-date voter rolls are vital to secure elections, but at the same time I want to ensure that anyone potentially affected by this routine process has notice and opportunity to update their information. That is why my office is releasing the full list to ensure that people who are still eligible voters can update their information.").

**E.  The Boards Consider and Refuse to Reject Frivolous Voter Residency Challenges on the Eve of the January 5, 2021 Runoff Elections.**

65.     On November 3, 2020, elections were held for both of Georgia's U.S. Senate seats.

66.     In the regularly scheduled Senate election, no candidate received a majority of the vote, so the top two finishers, Jon Ossoff and David Perdue, advanced to a runoff election to be held on January 5, 2021.

67.     In a special election for the seat vacated by former Senator Johnny Isakson, no candidate received a majority of the vote, so the top two finishers, Raphael Warnock and Kelly Loeffler, advanced to a runoff election to be held on January 5, 2021.

68.     Registrars began mailing absentee ballots for the runoff as early as November 18, 2020.

69.     The voter registration deadline for the runoff was December 7, 2020.

70.     In-person early voting for the runoff began on December 14, 2020.

71.     As of December 19, 2020, over 1,313,500 absentee ballots have been requested and more than 1,336,000 in-person early votes and mail-in votes have already been accepted for the runoff elections.

72.     On December 23, 2020, the Ben Hill Board voted 2-1 to find that a challenge to 328 voters was supported by probable cause with respect to voters who had changed their address out of state.

73.     On information and belief, the challenge was based solely on a purported attempt to match the list of registered voters in Ben Hill County with NCOA data.

74.     On information and belief, the Ben Hill Board voted against the recommendation of the county attorney, Nick Kinsley, who informed the Board prior to voting of his beliefs that probable cause *did not* exist, that this list failed to include the reason for a change of address, that

this list would be inadmissible in court, that the veracity of the list could not be confirmed, and that there were other, better remedies available.

75.     On information and belief, these Targeted Voters will be forced to cast provisional ballots that may not be counted.

76.     On December 14, 2020, the Chair of the Muscogee County Republican Party, Ralph Russell, lodged a challenge with the Muscogee Board under O.C.G.A. § 21-2-230(a) against 4,033 individuals (the "Targeted Voters") registered to vote in Muscogee County.

77.     The Targeted Voters were allegedly identified by comparing the Muscogee County voter registration database against the NCOA registry.

78.     In his letter bringing this mass challenge, attached hereto as Exhibit B, Russell provides no details of the methods he used to conduct the comparison of the voter registration list against the NCOA data. Without a detailed explanation, it is impossible to determine the reliability of his match list.

79.     Rather, he uses vague, passive language that suggests he may not have conducted the alleged match himself and may have no personal knowledge of its accuracy. *See* Ex. B at 1 ("This information *was gathered* by running the Muscogee County voter registration data base against the National Change of Address Registry." (emphasis added)).

80.     The utter lack of evidence of the accuracy of the challenged voter list is alone sufficient to negate any finding of probable cause. Otherwise, any challengers can present a list—however voluminous they desire—that they claim includes unlawful voters and unilaterally impose additional burdens on those voters, notwithstanding the absence of any support for the challengers' accusations.

81.     Russell's letter implicitly recognizes that his reliance on NCOA data is speculative at best, stating only that "[he] *believe*[*s*] that each of the individuals named . . . has . . . removed to another state with the intention of making the new state their residence." Ex. B at 1-2. NCOA data makes no mention of why any individual requested a change of address, and Russell offers no support for his conclusory belief that all individuals named moved with these intentions.

82.     On December 18, True the Vote—a Tea-Party affiliated organization with a history of using voter challenges and other tactics to intimidate and suppress minority voters[9]—announced publicly that it was behind these challenges, which are only small part of its unprecedented statewide voter intimidation effort.[10] True the Vote alleges that it has "partner[ed] with Georgians in every county," like Ralph Russell, to mount a "landmark coordinated challenge" seeking "to [p]reemptively [c]hallenge 364,541 [*p*]*otentially* [i]neligible [v]oters" based on NCOA data.[11]

83.     Other Georgia counties have swiftly and properly refused to entertain identical coordinated mass voter challenges brought by individuals working in concert with True the Vote.

84.     The Muscogee County Board, however, held a meeting to consider the mass challenge on December 16, 2020. And despite the fact that Russell did not attend the meeting and, therefore, provided no additional evidence to support his accusations, the Muscogee Board (in a

---

[9] *See, e.g.*, Dan Harris & Melia Patria, *Is True the Vote Intimidating Minority Voters from Going to the Polls?*, ABC News (Nov. 1, 2012), https://abcnews.go.com/Politics/true-vote-intimidating-minority-voters-polls/story?id=17618823; Suevon Lee, *A Reading Guide to True the Vote, the Controversial Voter Fraud Watchdog*, ProPublica (Sept. 27, 2012), https://www.propublica.org/article/a-reading-guide-to-true-the-vote-the-controversial-voter-fraud-watchdog; Liz Kennedy et al., *Bullies at the Ballot Box: Protecting the Freedom to Vote Against Wrongful Challenges and Intimidation*, Dēmos (Sept. 10, 2012), https://www.demos.org/research/bullies-ballot-box-protecting-freedom-vote-against-wrongful-challenges-and-intimidation.
[10] *True the Vote Partners with Georgians in Every County to Preemptively Challenge 364,541 Potentially Ineligible Voters*, *supra* note 1.
[11] *Id.* (emphasis added).

3-1 vote) erroneously concluded, based solely on alleged mass lists of unverified NCOA data comparisons, that there was probable cause to support the challenge.[12]

85.     Notably, the Muscogee Board decided to exempt any individuals on the challenge list who were entitled to vote under the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") because the Board believed such individuals were more likely to change residences; yet the Board ignored all other perfectly reasonable explanations why voters may change their addresses temporarily—including, for example, to attend school, for employment, or to care for a relative—while maintaining a permanent residence in Georgia.

86.     Despite this determination, absentee ballots returned by UOCAVA voters remained marked as "challenged" nearly a week after they were to be removed.

87.     The Muscogee Board placed the names of the remaining Targeted Voters on a list and instructed that if any individual on that list attempts to vote in person, the individual will be given notice of the challenge and will be forced to vote a provisional ballot. If a listed individual requests an absentee ballot, that individual will be required to present further evidence of residency in order to exercise the right to vote.

88.     Pursuant to these instructions, Targeted Voters who have attempted to early-vote for the runoff elections for U.S. Senate will be required to cast provisional ballots and take additional steps—including affirmatively producing evidence of their residency on an expedited timetable—to prove they are eligible to vote.

89.     The Boards will examine the information contained on the documents submitted by Targeted Voters and "make a good faith effort to determine whether the person casting the

_____

[12] Tim Chitwood, *Columbus Republican leader files challenge to thousands of voters with out of state addresses*, Columbus Ledger-Inquirer (updated Dec. 17, 2020), https://www.ledger-enquirer.com/news/politics-government/election/article247890295.html.

provisional ballot was entitled to vote in the primary or election." O.C.G.A. § 21-2-419(b). According to state law, "[s]uch good faith effort shall include a review of all available voter registration documentation, including registration information made available by the electors themselves and documentation of modifications or alterations of registration data showing changes to an elector's registration status," as well as additional sources of information. *Id.*

90.     Thus, a provisional ballot will be counted *only* if the Boards *affirmatively* determine that the Targeted Voter "timely registered to vote and was eligible and entitled to vote in such primary or election." O.C.G.A. § 21-2-419(c)(1).

91.     A provisional ballot will not be counted if the Boards determine that the Targeted Voter "did not timely register to vote or was not eligible or entitled to vote in such primary or election." O.C.G.A. § 21-2-419(c)(3).

92.     Importantly, a Targeted Voter's provisional ballot will not count if the Boards are "unable to determine" conclusively whether the voter is eligible to vote. *Id.* But by accepting the unlawful challenges in Ben Hill and Muscogee Counties and by effectively shifting the burden to voters to re-prove their eligibility, the Boards' actions *directly conflict* with Georgia law, which states that a registrar's approval of the Targeted Voter's existing registration "shall be *presumptive evidence* of a person's residence for voting purposes." O.C.G.A. § 21-2-217(b) (emphasis added).

93.     The Muscogee Board has stated that it will not make final determinations on *which* challenged votes to count until it meets *after* the January 5 runoff to certify the official results. Thus, all Targeted Voters will not know whether their votes will be counted until it is entirely too late to remedy any erroneous deprivation of their right to vote.

## CLAIMS FOR RELIEF

### COUNT I
### National Voter Registration Act
### 52 U.S.C. § 20507(d)

94.     A successful or unrebutted voter challenge based on alleged change of residency under O.C.G.A. § 21-2-230 results in the removal of the challenged elector's name from the list of registered voters. *See* §§ 21-2-230(f), (g), (h), (i). Accordingly, any action taken by the Board in response to these challenges must be consistent with federal laws regulating registration list maintenance, including the National Voter Registration Act ("NVRA").

95.     Section 8(d) of the NVRA prohibits the removal of individuals from voter registration lists unless strict procedures are followed. Specifically, "[a] State ***shall not remove*** the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant changed residence ***unless***" it follows the procedures set out therein, which require that: (1) the State receive written confirmation from the voter of change of address, or (2) the voter fails to respond to a postcard notice, and also fails to vote in at least two subsequent federal general election cycles. 52 U.S.C. § 20507(d)(1) (emphasis added).

96.     The Boards have not received any allegation that any Targeted Voter has confirmed a change of address in writing to the State or received official notice from the State and failed to vote in two subsequent elections. There is no other basis to believe any Targeted Voter has satisfied either of these preconditions for removal.

97.     State and federal courts have consistently held that Section 8(d) of the NVRA prohibits boards of elections from removing individuals from the voter registration rolls in response to voter challenges like those lodged in Ben Hill and Muscogee Counties. *See, e.g.*, *Schmitz*, Ex. A (denying a request under O.C.G.A. §§ 21-2-229 and 21-2-230 for immediate

hearings on mass registration and voter challenges brought on the basis of alleged change-of-address data because the hearings were not required by Georgia law and removal of challenged voters was prohibited by the NVRA); *N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, No. 1:16CV1274, 2018 WL 3748172, at *4-*5 (M.D.N.C. Aug. 7, 2018) (granting summary judgment against three county boards of elections for violating Section 8(d) of the NVRA by canceling thousands of voter registrations for alleged changes of residency); *Mont. Democratic Party*, 581 F. Supp. 2d at 1082 ("Because the federal [NVRA] makes it illegal to deny an elector his or her vote based on a change of address, subject to limited exceptions not implicated here, if Montana county election officials are required, or even allowed, to compel an elector challenged on the basis of change-of-address information to prove anything, there is a violation of federal law.").

98.    Because the challenge letters received by the Boards do not provide any evidence that any Targeted Voter confirmed a change of address in writing or received official notice and failed to vote in two subsequent general elections for federal office—let alone evidence sufficient to show that any Targeted Voter is indeed the individual that appears on the NCOA list, or that the voter moved permanently—Plaintiffs are entitled to an injunction prohibiting the Board from requiring any Targeted Voters to prove they are qualified to vote at the address where they are registered.

## COUNT II
## National Voter Registration Act
## 52 U.S.C. § 20507(c)

99.    Section 8(c) of the NVRA provides an additional, independent prohibition on any action the Board has taken or may take to impede any Targeted Voters from casting regular ballots in the January 5 runoff elections for U.S. Senate.

100.     Section 8(c) requires that "[a] State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A).

101.     This section of the NVRA has been interpreted to apply not just to regular voter list maintenance programs, but also to voter challenges like those sought here. *See*, *e.g.*, *Schmitz*, Ex. A; *N.C. State Conf. of NAACP*, 2018 WL 3748172, at *5-*7 (holding that county boards of elections violated section 8(c) by relying on "generic evidence [that] conveyed no information about each challenged voter's specific circumstances" when removing voters from the registration rolls within 90 days of a federal election); *Mont. Democratic Party*, 581 F. Supp. 2d at 1081, 1083 (noting "[t]he timing of the challenges is so transparent it defies common sense to believe the purpose is anything but political chicanery," and holding "if the State's procedure for evaluating voter challenges allows a county election official to conclude that any voter [] targeted on the basis of change-of-address information cannot vote, or that the elector has to prove anything before he or she is allowed to vote, the State would then be in clear violation of federal law.").

102.     While the Boards may not take action on the voter challenges in any event, at the very least Plaintiffs are entitled to an injunction prohibiting the Boards from preventing any Targeted Voters from casting a regular ballot in the January 5 runoff elections because of their inclusion on the Targeted Voter list.

**COUNT III**
**First Amendment and Equal Protection**
**U.S. Const. amends. I, XIV, 42 U.S.C. § 1983**

103.     Under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, a state cannot utilize election practices that unduly burden the right to vote. A court

considering a challenge to a state election law or practice must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that a plaintiff seeks to vindicate against the justifications put forward by the state for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

104.    This balancing test utilizes a flexible sliding scale, where the rigorousness of scrutiny depends upon the extent to which the challenged law burdens voting rights. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318-19 (11th Cir. 2019).

105.    Courts need not accept a state's justifications at face value, particularly where those justifications are "speculative," otherwise it "would convert *Anderson/Burdick*'s means-end fit framework into ordinary rational-basis review wherever the burden a challenged regulation imposes is less than severe." *Soltysik v. Padilla*, 910 F.3d 438, 448-49 (9th Cir. 2018) (citing *Pub. Integrity All. Inc. v. City of Tucson*, 836 F.3d 1019, 1024-25 (9th Cir. 2016)); *see also Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling opinion) ("However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests *sufficiently weighty to justify the limitation*." (citation and quotation marks omitted) (emphasis added)); *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1318-19 ("And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden. The more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law.").

106.    The Boards' decision to entertain a mass voter challenge—a challenge made as part of a coordinated voter intimidation scheme and based on notoriously unreliable evidence that is, at best, circumstantial—is not authorized by state or federal law. *See supra* ¶¶ 84-92.

107.    The Boards' unauthorized actions impose a severe burden on the right to vote.

108.     Thousands of duly-qualified voters in Ben Hill and Muscogee Counties who timely registered to vote in the January runoffs have been and will be forced to cast provisional ballots and take significant extra steps to prove they are eligible to vote in order to ensure their vote counts. Because many of the individuals are likely temporarily located away from their primary residence, being forced to unnecessarily re-prove their eligibility to vote on short notice will be difficult, and in some cases, impossible. Many of these voters will not cast their ballots until shortly before or on Election Day, resulting in even more insurmountable burdens when unexpectedly forced to re-establish their eligibility. The Boards' unlawful act poses a significant risk of disenfranchising these voters through no fault of their own.

109.     Any qualified voters that the Boards erroneously remove from registration rolls as a result of these impermissible challenges will be entirely disenfranchised, as the December 7 registration deadline for the January 5 runoff elections has long passed.

110.     Further, merely sending notice to these thousands of voters that their eligibility has been challenged or that they will only be permitted to cast a provisional ballot is a well-documented voter intimidation tactic that will discourage qualified Georgia voters from exercising their right to vote. "Voters might be intimidated, confused, or even discouraged from voting upon receiving notice that their right to vote—the most precious right in a government of, by, and for the people—has been challenged." *Mont. Democratic Party v. Eaton*, 581 F. Supp. 2d 1077, 1079 (D. Mont. 2008).

111.     Recognizing the severity of entertaining such a challenge, Georgia law permits the Boards to entertain a voter challenge only to extent that the challenger has demonstrated "probable cause." O.C.G.A. § 21-2-230(b). No such demonstration has been made. The Boards' complicity in this voter-suppression scheme imposes a severe burden on the right to vote.

112.    Alternatively, even if state and federal law authorized the Boards' actions—to be clear, they do not—Georgia's voter challenge statute would be unconstitutional as applied to these voters, whose rights to vote have been severely burdened en masse on the eve of a critical election, based solely on inconclusive and error-prone list-matching practices that have already been deemed insufficient under federal law to remove voters from registration rolls.

113.    There is no government interest that remotely justifies the Boards' actions. While the State may possess an interest in preventing actual voter fraud, that interest plainly cannot justify adopting a presumption—only a few weeks before an election—that thousands of Georgians are ineligible to vote unless they prove otherwise, merely because they have temporarily forwarded their mail.

114.    Further, *Anderson-Burdick* only contemplates "relevant and legitimate [government] interests," *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1318-19, but the Boards surely have no interest in taking actions that conflict with state law. The Boards' decisions to entertain these challenges are contrary to state law because a challenge filed under O.C.G.A. § 21-2-230(a) "***shall be denied***" if no "probable cause exists to sustain such challenge." *Id.* at (b) (emphasis added).

115.    Probable cause requires "a reasonable ground for belief," which is "something more than mere suspicion." *United States v. Cleckler*, 270 F.3d 1331, 1334 (11th Cir. 2001). "Rumor, suspicion, speculation or conjecture is not sufficient to show probable cause." *Zimmerman v. State*, 207 S.E.2d 220, 222 (Ga. App. 1974).

116.    No evidence was offered that could possibly meet that threshold. The notice of challenge received by the Muscogee Board—and on information and belief, the notice of challenge received by the Ben Hill Board—does not indicate that any Targeted Voters had been contacted to

confirm whether they *have*, in fact, changed their residency or—if they have moved—whether they did so for one of the many reasons permitted by statute that does not affect voting eligibility. *See, e.g.*, O.C.G.A. § 21-2-217. The notices fail to indicate if the challenger has any personal knowledge about any of the Targeted Voters whereabouts or intentions. The challengers did not appear at the Boards' hearing to offer evidence.

117.    Probable cause must be "individualized," *Autry*, 626 S.E.2d at 531, and "particularized with respect to that person," *Ybarra*, 444 U.S. at 91.

118.    There is nothing individualized or particularized about a mass challenge to hundreds of thousands of registered voters across the state, including 328 registered voters in Ben Hill County and 4,033 registered voters in Muscogee County. Based on a crude comparison of unreliable and vastly overinclusive NCOA data, the notice of challenge received by the Muscogee County Board states the challenger's "belief" that the Targeted Voters "removed to another state with the intention of making the new state their residence." On information and belief, the notice of challenge received in Ben Hill County is much the same. This suspicion, speculation, and conjecture about the intentions of thousands of registered voters—where the challengers do not purport to personally know any of the Targeted Voters or otherwise have any particularized information about why someone with the Targeted Voters' name changed a mailing address—is legally insufficient to support a determination of probable cause that any Targeted Voter lacks a right to vote in Ben Hill County or Muscogee County.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

119.    Declaring that the Boards' decisions to entertain these challenges violate Sections 8(c) and 8(d) of the National Voter Registration Act;

120.    Declaring that the Boards' decisions to entertain these challenges and force voters to cast provisional ballots or otherwise take additional steps to reprove their qualifications burden the right to vote in violation of the First and Fourteenth Amendments to the Constitution of the United States;

121.    Preliminarily and permanently enjoining the Boards from removing any Targeted Voters from the registration lists on the basis of NCOA data; from preventing any Targeted Voters from casting a regular ballot in the January 5, 2021 runoff elections on the basis of NCOA data; and from requiring any Targeted Voters to cast a provisional ballot or to present any additional evidence of eligibility on the basis of NCOA data;

122.    Granting Plaintiffs such other and further relief that the Court deems necessary and proper.


Respectfully submitted on this 29th day of December 2020.

*/s/ Adam M. Sparks*
Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks (lead counsel)
Georgia Bar No. 341578
KREVOLIN AND HORST, LLC
One Atlantic Center
1201 W. Peachtree Street, NW,
Ste. 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
hknapp@khlawfirm.com
jlewis@khlawfirm.com
sparks@khlawfirm.com

Marc E. Elias* (lead counsel)
Uzoma Nkwonta* (lead counsel)

Jacob D. Shelly**
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 800
Washington, DC 20005
(202) 654-6200

*Attorneys for Plaintiffs*
*\*Admitted pro hac vice*
*\*\*Pro hac vice application* forthcoming